GEORGE KELLY *et al. vs.* THOMAS P. NICHOLS *et al.*

A testator, with abundant expressions of pious wishes, devised his estate to trustees in trust as construed by the court : —

1. To keep in repair the graves of his sisters and himself ;
2. To keep his clock in repair ;
3. To keep his house open for the reception of ministers and others of his faith when " travelling in the service of truth."

*Held*, that none of these was a charitable use.

In connection with the provisions for keeping the house open as a hospice were intimations that the trustees might in their judgment apply the trust moneys to the relief of the poor, but the court found these intimations too vague to show either a general or a particular intent to constitute what would be a valid charitable use.

The will also contained provisions for publishing religious books of a defined character.

*Held,* that this was a valid trust in itself.

But the court, finding it impossible to tell what part or how much of the trust funds was to be expended on such publication, and what part or how much on the prior void trusts,

*Held,* that these trust provisions for publication also failed.

When an unascertainable part of a fund is given upon a void trust and the residue upon a valid trust, the whole fails.

BILL IN EQUITY to avoid a trust and for an account. On demurrer to the bill.

The will of Joseph Greene, formerly of Jamestown, and proven before the Probate Court of said Jamestown, September 19, A. D. 1840, is as follows : —

I, Joseph Greene, of the town of Jamestown, on the island of Canonicut, in the County of Newport, and State of Rhode Island, yeoman, considering the uncertainty of time, and the probability, from the long pilgrimage which I have already passed, that the close of my probationary existence is near at hand ; and also being desirous, while ability of body and soundness of mind and memory are mercifully continued, which at the present time is the case, of settling my temporal concerns in such manner as shall be consistent with and contribute to my own peace ; and also, as far as may be, promote the welfare of others, especially of those who are true believers in, and obedient followers and publishers of, that one, eternal, unchangeable truth and gospel of our Lord and Saviour, Jesus Christ, as it was (after the long and dark night of apostasy from the true faith, doctrine, and practice of the primitive church) again revived, powerfully preached, and faithfully testified unto, both by word and writing, through deep and cruel sufferings, by the early ancient Friends, and valiants for the truth (commonly called Quakers), and their true and genuine successors in the same faith, doctrines, and practices down to the present time ; of which truth, gospel, faith, doctrines, testimonies, and practices I am a witness (as well as a member of the Religious Society of Friends), and I do desire the extension of the living knowledge and way thereof, until righteousness shall cover the earth as the waters do the sea ; and my will and intent is, that such part of the estate which has

been (thro' divine favor) bestowed on me, and which is herein-after described, shall, according to the directions, limitations, and instructions hereinafter given, be singly, strictly, and faithfully ap-plied only in the service of the same, and (as far as may or can be the case) to the honor and spread thereof, and to the comfort and relief of such persons as are and shall be true and practical believers in, living witnesses of, and faithful standard-bearers and testimony-bearers to and for the same divine, eternal truth, above mentioned, forever, — I do, therefore, make and declare this my last will and testament, in manner and form following, that is to say : My will is, that after my decease, my body shall be decently interred in the northwest corner of my nether orchard, — the spot which I, and my two sisters hereinafter named, have selected for a place of burial for ourselves ; and that the graves shall be from time to time kept in good and decent order and repair, and also inclosed with a good stone wall or fence, by my executors hereinafter named ; and that this care shall continue to rest upon their successors, in the trust which I shall bestow upon them ; and that all my just debts and funeral expenses be discharged by them, within some con-venient time after my decease.

And then, first of all, unto my well-beloved, faithful friends, Henry Gould, Thomas B. Gould, and Thomas P. Nichols, I give, devise, and bequeath, all my real and personal estate whatsoever, and wheresoever to be found ; particularly my farm on the island of Canonicut, known by the name of the Greene Farm, and the house thereon standing, in which I now live (and where my prede-cessors of the same name have lived for generations back, if not from the first settlement of the island by the English emigrants) ; and all land which I have bought from time to time and added thereto ; together with all and singular the houses, barns, and other outbuildings thereon standing, and all the rights, privileges, and appurtenances, of what kind or nature soever, thereto belonging or appertaining, to be and remain unto the said Henry Gould, Thomas B. Gould, and Thomas P. Nichols, and to their successors forever, in trust.

*Secondly.* My earnest and anxious desire is, and I hereby enjoin it upon my said trustees, that they take the utmost kind and very affectionate care of my ever dear and tenderly beloved

sisters, Anne Greene and Mary Greene, during the lives of the said Anne and Mary. And for the purpose of enabling my said trustees to support and take such care of my said sisters, I hereby authorize and empower my said trustees, if necessary, to sell and dispose of any portion of my said estate, real or personal, first exhausting the personal estate.

*Thirdly.* My will is, that after the decease of my said sisters, my farm and land above mentioned on the island of Canonicut (to all of which I hereby apply the name of the Greene Farm), together with all and singular the houses, barns, and other outbuildings thereon standing, and all the rights, privileges, and appurtenances, of what kind or nature soever, thereunto belonging, shall be and remain unto the said Henry Gould, Thomas B. Gould, and Thomas P. Nichols, and their successors, qualified and chosen in the manner following, forever; that is to say, when it shall happen that one or more of those three trustees decease, the survivors or survivor shall make choice of a man or men of understanding, who shall be sound in the faith of the gospel of Christ, as the same is set forth in the preamble to this, my last will and testament, and in Robert Barclay's " Apology for the True Christian Divinity," as well as in other writings of the primitive Friends, more particularly hereafter referred to, to succeed in the place of him or them so deceased; and in case the two survivors differ in their choice of the man so to succeed in the place of him so deceased, then they shall agree upon some faithful friend, to whom they shall refer the matter, and he shall by virtue hereof be qualified to act for the time being as one of them, that is to say, in the choice of a successor; and if they three cannot be united in that choice, his voice, together with one of the survivors, shall decide the matter; and the person's name so chosen shall be recorded on the record-book of the trustees and signed by the clerk; and he shall be the trustee with the survivors of said trustees, and shall have equal power to act with them, or either of them, in all matters relating to the disposal of the rents and profits of the said Greene Farm, from time to time; and so all persons chosen and qualified as above said, to keep good the said number of three trustees, shall be deemed and taken for the trustee or trustees herein with said survivor, which said persons, or their said successor, or

successors, chosen and succeeding as above said, shall be seized of the said farm and land (called the Greene Farm), to the use and uses following; that is to say, faithfully and truly to distribute and dispose of the net rents and profits of my said farm forever, according to such directions, limitations, and instructions as I have hereinabove given, or may hereinafter give, and also according to such as I shall more particularly give unto them in an instrument of writing under my hand and seal bearing even date with these presents, and which shall be forever deemed and taken to be of the same force and virtue with this, my said last will and testament.

*Fourthly.* My will is, that after the decease of my sisters above mentioned, my clock shall continue to stand where it now does, in the southeast corner of my east front room, and shall be kept in repair by my trustees above mentioned, or so long as they may deem it proper and practicable; and further, my will is, that inasmuch as my house has been open during my lifetime (as well as for generations back, in the lifetime of my ancestors of the same name) for the reception and entertainment of ministers and others travelling in the service of the truth, so it shall continue to be a place for the reception and entertainment of such forever, in conformity with the preamble of this, my last will and testament, and in the discretion of my trustees. And my will further is, that my west front room chamber shall be kept in constant readiness to lodge such persons as shall cross over or visit this island in the course of their labors in the gospel of Christ, and others who are not ministers, but who are travelling to meetings or otherwise in the service of truth, and that the said room be kept furnished with two good bedsteads, two beds, two bolsters, and two pair of pillows, and other necessary furniture.

*Fifthly.* I give and bequeath to my beloved brother, Jonathan Greene, the sum of one hundred dollars, but in the event of his removal by death before the time hereinafter provided for the payment of these legacies, then the said sum of one hundred dollars to be paid to his son, David Greene; and I also give to the said David the further sum of two hundred dollars.

*Sixthly.* I give and bequeath unto John E. Greene, the son of my brother, Jonathan Greene, the sum of five dollars.

*Seventhly.* I give and bequeath unto William Greene, and Joseph Greene, sons of my brother, Jonathan Greene, the sum of one hundred dollars each.

*Eighthly.* I give and bequeath unto the two daughters of my said brother, Jonathan Greene, the sum of one hundred and fifty dollars each.

*Ninthly.* I give and bequeath unto my friend and cousin, Henry Gould, above mentioned, the sum of one hundred dollars.

*Tenthly.* I give and bequeath to my beloved cousin, Abigail Gould, the wife of Henry Gould, the sum of one hundred dollars.

*Eleventhly.* I give and bequeath unto my beloved cousin, Mary Gould, the sum of fifty dollars, but in the event of her decease before the time hereinafter provided for the payment thereof, then the said sum of fifty dollars to be paid to my cousin, Thomas B. Gould.

*Twelfthly.* I give and bequeath to my beloved cousin, Lydia Ann Gould, the daughter of my cousins, Henry and Abigail Gould, the sum of fifty dollars.

*Thirteenthly.* I give and bequeath unto my friend and cousin, Thomas B. Gould, above mentioned, the sum of fifty dollars.

*Fourteenthly.* I give and bequeath unto my friend, Thomas P. Nichols, the sum of fifty dollars; in token of my friendship for him, and also as some degree of compensation for his care and trouble in discharge of the trust to which I have appointed him.

*Fifteenthly.* I give and bequeath unto Hannah Douglas, the daughter of Joseph and Abigail Douglas, the sum of fifty dollars.

*Sixteenthly.* I give and bequeath unto Mary Carr, the daughter of Benjamin and Elizabeth Carr, the sum of fifty dollars; and also the use and actual occupancy, by herself, of my east front room chamber, with the bedroom and the two small rooms adjoining over the kitchen, and a passage up and down both the front and back stairs, and through the kitchen and washroom, together with the privilege in the cellar and woodhouse of putting her vegetables and her wood therein, and a privilege of drawing water out of the well, and to the rain-water also. All of which to be and remain unto her during her natural life, provided she remain single, and continue to live with my said sisters (though not without wages); and to be respectful, kind, and attentive to them, so long as they,

or either of them, live. And if the said Mary should be disposed to have her aunt, Hannah Douglas, to live with her, my will is that she should share with the said Mary in this bequest (except in the sum of money above mentioned), provided she shall conform in all respects to the same conditions imposed upon Mary, but she, the said Mary, shall have no power to let or lease the rooms above mentioned, or to bring in any other person or persons to live with her, contrary to the mind of my trustees.

*Seventeenthly.* The legacies to the children of my brother, Jonathan Greene, are absolute legacies, and in the case either or any of them decease previous to the time of payment, the sum or sums respectively given to him, her, or them so deceased, are to be divided equally among the survivors, or to be paid to the survivor of them; and I direct that the same rule be observed in respect to the payment of those legacies bequeathed to my cousins, Henry, Abigail, Lydia Ann, and Thomas B. Gould, they being also absolute legacies; and further my will is, and I direct, that none of the legacies herein given be paid during the lifetime of either of my said sisters; nor until such periods of time after their decease, in each case, as may suit the convenience of my executors, and they may deem reasonable and proper.

*Eighteenthly.* I give and bequeath unto my cousin, Thomas B. Gould, above mentioned, my desk and bookcase, standing in my east front room (it was my brother David's), together with all my books and papers, whether printed or in manuscript; the manuscript journal of my late and ever dear brother, David Greene, and all the rest of his books and papers, whether printed or in manuscript; and all my household furniture of whatever description, together with all the rest and residue of my estate and effects of every kind and nature not hereinbefore disposed of.

*Lastly.* I hereby nominate, constitute, and appoint my friends, Henry Gould, Thomas B. Gould, and Thomas P. Nichols, above mentioned, sole executors of this, my last will and testament, hereby revoking and annulling all other and former wills by me made, and establishing this, and this only, as my last will and testament, contained together with my said instructions on the three preceding and annexed pages.

In testimony whereof, I have hereunto set my hand and seal,

this fifth day of the eleventh month, in the year (according to the Christian account) one thousand eight hundred and thirty-nine. 1839.

JOSEPH GREENE. [L. S.]

Signed, sealed, published, pronounced, and declared by the said Joseph Greene, as and for his last will and testament, in the presence of us, who at the same time at his request, and in his presence, and in presence of each other, hereunto set our names as witnesses to the same.

ELIJAH ANTHONY,
WM. S. NICHOLS,
H. Y. CRANSTON.

WHEREAS, I, Joseph Greene, of the town of Jamestown, on the island of Canonicut, in the County of Newport, and State of Rhode Island, yeoman, did on the day of the date hereof make and publish my last will and testament, and therein and thereby did give, grant, and devise my farm and land in said Jamestown, which I have designated as the Greene Farm, unto you, Henry Gould, Thomas B. Gould, and Thomas P. Nichols, and your successors, chosen and qualified as in my said will is provided, for you and them faithfully to distribute the net rents and profits thereof, in the service of truth, as set forth in the preamble to my said will, and according to such directions, limitations, and instructions as I should further give unto you ; I do therefore, in pursuance thereof, now signify unto you, that the principles, doctrines, testimonies, and practices to which I have all along referred are those which are held and promulgated by George Fox, Robert Barclay, Isaac Pennington, William Penn, George Whitehead, Samuel Fisher, Francis Howgill, Edward Burrough, Richard Claridge, and others, of the early Friends (for they spoke the same language, and bore a faithful, consistent, and united testimony to the truth, as it is in Jesus Christ, who is the way, the truth, and the life, and the true light and life of men, the Alpha and Omega, the first and the last, the beginning and ending) ; and in order to prevent you and your successors from falling into any mistake whatever, in respect to the qualifications of such persons, who are to receive the benefits of this trust, or the nature of those principles which you and they are to be found in the faithful maintenance and support of, I do

refer to the published works of those persons above mentioned, severally and collectively; but as they are very extensive, I will particularly refer to George Fox's Journal, Robert Barclay's Apology, his "Catechism and Confession of Faith," and his "Anarchy of the Ranters," etc.; the last has been printed in modern times under the title of "A Treatise on Church Government," and all of them have been officially and repeatedly sanctioned by the Society of Friends (commonly called Quakers), and extensively circulated as standard works, containing their principles from the first down to these times. And these are also to inform you, and all whom it may concern, that if any person or persons claiming to be members, ministers, elders, overseers, or committees of the said Society, have avowed and published, or shall avow, publish, maintain, or defend, either by word or writing, any principles or doctrines contrary to and subversive of all those along referred to by me, the mere membership or station of such persons in said Society shall furnish no claim to the benefits of this trust; neither shall the benefits thereof be extended to any individuals who shall unite with and support those personally who have published and do hold such principles, although they may, while giving such personal support, pretend to dissent from their views.

Furthermore: if at any future time the Society of Friends generally, or any particular local section thereof, should depart from or deny any of its first principles, as set forth in the standard works above referred to, and should adopt new and unsound principles contrary to and subversive of those for the support of which they were originally raised up and gathered into a distinct religious society; or if the Society should continue to commit itself to and identify itself with such principles, by officially acknowledging unity with persons, especially as ministers, or in other prominent stations, who have published and do hold them; and in consequence of such weakness, unfaithfulness, and degeneracy, a general or local separation should again take place in the Society; or if the defection in principle should be so overwhelming in its character (which I hope it will not), that those who faithfully bear testimony against it (whether in the particular or in the general), being few in number, shall be deprived of their membership, on account of such, their testimony, and, as it were, be driven into the wilderness, that

is, cease to be known as in a gathered and visible church state (while those who have actually departed from that light, spirit, and power of Christ, which alone constitutes a true church, still retain the name) : in either case you are to follow the original principles of truth, in the application of the benefits of this trust, without regard to the outward appearance, mere name, lifeless profession, numbers, or majority of such apostates. It is the support of the principles of truth as originally held by the first Friends, which is to be constantly kept in view, and not of the society in an impure and degenerated state. The particular cases in which you shall apply the means in your hands to the personal relief of the poor, or otherwise in the service of truth, I leave to your judgment, and to that of your successors; only, I would have you and them, as your means shall increase and allow it, to use a part thereof in the reprinting and circulating such of the writings of the early Friends as are likely to be most useful, and otherwise go out of print and be lost, as well as those of more modern times, written in defence of the same principles, and to set forth the purity and spirituality of the gospel dispensation. And I also desire, if it be practicable, that you and your successors would, from time to time, place such tenants upon my farm, and in my house, as shall make it an agreeable and comfortable home, in the best sense, to those whose lots may be cast there in the course of their labors and travels in the service of truth.

In testimony whereof, I have hereunto set my hand and seal this fifth day of the eleventh month, in the year one thousand eight hundred and thirty nine. 1839.

JOSEPH GREENE. [L. S.]

Signed and sealed in the presence of us.

ELIJAH ANTHONY,<br>WM. S. NICHOLS,<br>H. Y. CRANSTON.

February 16, A. D. 1889, the heirs at law of Joseph Greene brought their bill in equity against Thomas P. Nichols, surviving trustee and the Attorney General of the State, asking that the trusts of the will be declared void, that the trustee be directed to convey the trust estates to the complainants, and for an account. To this bill the respondent trustee demurred, and the case was argued on the question of the validity of the trusts.

*Providence, March* 14, 1891. STINESS, J. Joseph Greene, of Jamestown, died in 1840, leaving a will, by which he gave his real and personal estate to trustees, to be by them held in trust, after payment of his debts, funeral expenses, and the care of two sisters during their lives, for the following purposes forever, namely: *First,* " that the graves," of his sisters and himself, " should be, from time to time, kept in good and decent repair ; " *second,* that the trustees shall " distribute and dispose of the net rents and profits of my said farm according to such directions, limitations, and *instructions* as I have hereinbefore given, or may hereinafter give, and also according to such as I shall more particularly give unto them in an instrument of writing under my hand and seal, bearing even date with these presents, and which shall be forever deemed and taken to be of the same force and virtue with this my said last will and testament ; " *third,* that his clock shall continue to stand in the southeast corner of his east front room and be kept in repair by his trustees, so long as they may deem it proper and practicable ; " and further my will is, that inasmuch as my house has been open during my lifetime (as well as for generations back, in the lifetime of my ancestors of the same name), for the reception and entertainment of ministers and others travelling in the service of truth, so it shall continue to be a place for the reception and entertainment of such forever, in conformity with the preamble of this, my last will and testament, and in the discretion of my trustees. And my will further is, that my west front room chamber shall be kept in constant readiness to lodge such persons as shall cross over or visit the island in the course of their labors in the gospel of Christ, and others who are not ministers, but who are travelling to meetings or otherwise in the service of truth, and that the said room be kept furnished with two bedsteads, two beds, two bolsters, and two pair of pillows, and other necessary furniture."

The instrument in writing referred to in the will and probated as a part of it is devoted mainly to a particular designation of the class of persons entitled under the will to distribution of the net rents and profits of the farm, closing with these words: " *It is the support of the principles of truth as originally held by the first Friends,* which is to be constantly kept in view, and not of the society in an impure and degenerated state. *The particular*

*cases in which you shall apply the means in your hands to the personal relief of the poor, or otherwise in the service of truth, I leave to your judgment, and to that of your successors; only,* I would have you and them, as your means shall increase and allow it, to use a part thereof in the reprinting and circulating such of the writings of the early Friends as are likely to be most useful, and otherwise go out of print and be lost, as well as those of more modern times, written in defence of the same principles, and to set forth the purity and spirituality of the gospel dispensation. And I also desire, if it be practicable, that you and your successors would, from time to time, place such tenants upon my farm, and in my house, as shall make it an agreeable and comfortable home, in the best sense, to those whose lots may be cast there in the course of their labors and travels in the service of truth."

An inspection of the will shows that the testator was an earnest believer in the doctrines of the early Friends, and was profoundly attached to the precepts of the society. To his mind they comprehended the sum and substance of the truth, and only such as were in sincere accord with those doctrines and precepts could be looked upon as the genuine successors of the early and ancient Friends, and "faithful standard-bearers and testimony-bearers to and for the same divine, eternal truth." He regarded those whose religious views differed from his standard with keen antipathy and alarm, counting them as heretics and apostates. He desired to do what he could for the honor and spread of the truth, and evidently thought this could best be accomplished by promulgating the orthodox faith in meetings and in books. He therefore pointed out the writings of the primitive Friends which should be taken as the standard of orthodoxy, and to promote his scheme he devoted his property, chiefly, to the reception and entertainment of ministers and others travelling in the service of truth, according to such standard, and in part, if the income should allow it, to the publication and distribution of the writings of early Friends. The question before us is, whether the testamentary gift is valid as a gift to charitable uses.

This question can only be determined by the purposes for which the gift is made as disclosed in the will. The first designated purpose is the care of the graves. Among all classes there is

a pervading sentiment of reverence for the burial-places of the dead, which springs naturally from the Christian belief in the resurrection of the body. This sentiment is recognized in this State and elsewhere, by the creation of corporations for maintaining and adorning cemeteries, and by statutes which allow town councils to receive and hold funds in trust for the care of burial lots. However general and commendable this sentiment may be, and however desirable it may be that the graves of the dead be decently and reverently cared for, nevertheless we do not think a bequest of this kind falls within the limits of a charitable use. It is not a gift in aid of any public object, nor for a purpose which affects the public in any way. It benefits no one. Its purpose is purely private and personal. It seeks to create a perpetuity simply to insure the care of the testator's own burial lot. It does not run to a corporation created for this special purpose or authorized by its charter to receive such gifts, but to trustees in perpetuity. It is now well settled in England that such bequests are void. Cases on this subject are fully collected in Tyssen on Charitable Bequests, Chapter VII., and also in *Jones* v. *Habersham*, 107 U. S. 174, 183, where Judge Gray says: "In England there has been a difference of opinion upon the question whether the maintenance and repair of the tomb or monument of the donor is a good charitable use. Down to the time of the American Revolution, as by the civil law, it appears to have been held that it was. According to the later English cases it is not."

We think this latter view is to be regarded as the rule in this country. It is expressly so held in *Bates* v. *Bates*, 134 Mass. 110; *Johnson* v. *Holifield*, 79 Ala. 423; *Piper* v. *Moulton*, 72 Me. 155; *Coit* v. *Comstock*, 51 Conn. 352; *Fite* v. *Beasley*, 12 Lea, Tenn. 328; *Hornberger* v. *Hornberger*, 12 Heisk. Tenn. 635. See, also, *Giles* v. *Boston Fatherless & Widows' Society*, 10 Allen, 355. In the Amer. & Eng. Encyclopædia of Law, vol. 3, tit. Charities, § 8, it is stated: "A trust to erect and maintain monuments or tombs of the donors or others is now generally upheld in this country, though not in England." An examination of the three authorities cited in support of this statement shows that it is not warranted by the decisions in those cases. In *Jones* v. *Habersham*, 3 Woods, 443; 107 U. S. 174, a bequest to keep a burial-place in good order

was held to be valid, because the code of Georgia enumerates among charitable uses, " the improvement or repair of burying-grounds or tombstones." In *Dexter* v. *Gardiner*, 7 Allen, 243, a bequest in trust form, " the income of which is to be appropriated for the benefit of the Friends' meeting," was held not to be invalid, because the purchase and repair of burying-grounds is regarded by Friends as one of their religious duties; to which under their usages and discipline they apply their funds. It was a good bequest to a religious society for religious purposes, and the court says: " Where a denomination of Christians regard the providing and oversight of burying-grounds as a religious duty, accompanying burials of the dead with religious services, as is usual among most sects of Christians here, it is difficult to see by what principle this religious duty can be distinguished from that of maintaining and repairing meeting-houses, in respect to the statute." That case, therefore, stood upon a very different ground from a bequest like the one before us. The other authority cited is *Swasey* v. *American Bible Society*, 57 Me. 523. The court, in its opinion, indeed, says that bequests for the repair of tombs have been recognized as charitable; but, very surprisingly, it cites as its only authority for the statement two cases which decided exactly the opposite. Perry on Trusts, § 706, states that such bequests have been held good, but he cites only the cases above referred to. We therefore think that both English and American authorities are in accord in declaring that a bequest of this character is not a charitable bequest.

The second designated duty of the trustees to keep the clock in repair requires no consideration. It is not claimed that this can be sustained as valid.

The third and principal object of the trust is that relating to the entertainment of ministers and others, travelling in the service of truth, and the maintenance of his house as a hospice for that purpose. The testator evidently believed it was necessary to proclaim the true faith, and that orthodox preachers and faithful believers should be encouraged to keep up their visits to the island where he lived, " in the course of their labors for the gospel," by the assurance of an open house for their welcome and stay. His idea was to promote the teaching of truth by the testimony of min-

isters and others who should attend the meetings of Friends there or elsewhere. In the abundance and minuteness of directions for determining who should receive the benefit of his bounty, he shows such a zealous desire for the spread of the truth as he believed it, that one is liable to mistake his fervent, though vague, expectation for the direction and trust of the will. The question is not alone what result did he hope to subserve, but what did he order to be done, which determines whether or not he created a charitable trust. The simple thing he orders to be done is to keep his house open forever to receive and entertain those who may be travelling that way, to or from a meeting of Orthodox Friends. Leaving out of account the objection which is made that the court cannot enforce such a trust because it cannot determine who would be entitled as true believers, within the meaning of the will, we do not think this provision is for a charitable use. It is not a gift to a religious society, nor directly to religious objects, but only for hospitality; which is the exercise of benevolence and liberality rather than charity, as that term is used in law. If the gift be not to a charitable use, the court cannot make it such simply because it sees the testator hoped its effect would be to accomplish a charitable end. The books are full of cases where an indefinite charitable design was plain enough, but where the testator failed to make a gift to a definite charitable use. In such cases there can be no application of the doctrine of *cy pres.* In this case the testator hoped to aid the cause of truth after his death as he had done in life, and as he says in his will his ancestors had done before him, by encouraging true believers to go about bearing testimony, in the welcome and comfort they would find at his house. *In re Hewitt, Mayor of Gateshead v. Hudspeth,* 49 Law Times Rep. N. S. 587, a bequest by which the income was to be expended in acts of hospitality or charity was held to be void. See, also, *Morice v. The Bishop of Durham,* 9 Ves. Jun. 399; *Attorney General v. Haberdashers' Co.* 1 Myl. & K. 421, 428. But it is claimed by the respondents that the trust should be interpreted as one for the benefit of the poor. We should be quite willing to adopt such a construction if we could do so, but we do not see that the language of the will allows it. The house is to be kept open for the reception of ministers and others without regard

to their condition, and subject only to the requirement that they shall be travelling in the service of truth. In the preamble, he says his intent is, "that *such part of the estate* which has been through divine favor bestowed on me, and which is hereinafter described, *shall, according to the directions, limitations, and instructions hereinafter given, be singly, strictly, and faithfully applied only in the service of the same, and, as far as may or can be the case, to the honor and spread thereof, and to the comfort and relief of such persons as are and* shall be true and practical *believers* in, living witnesses of, and faithful standard-bearers and testimony-bearers to and for the same divine, eternal truth, above mentioned, forever."

It is claimed that the words, "comfort" and "relief" indicate a class of believers to whom relief is necessary. If this were all, perhaps we might say so; but he expresses his intent to minister to the comfort and relief of believers, strictly "according to the directions, limitations, and instructions hereinafter given." When we turn to those instructions, in the declaration of the trust, we find no discrimination in favor of the poor, but all who travel in the service of truth are embraced within their terms. The only reference to the poor is in the instrument appended to the will: "The particular cases in which you shall apply the means in your hands to the personal relief of the poor, or otherwise in the service of truth, I leave to your judgment and to that of your successors." While this implies that some portion of the funds may be used for the personal relief of the poor, it by no means limits or directs the application of the funds to such use; and the phrase "or otherwise in the service of truth " places a use for the poor, at most, only as an alternative with the other uses which the testator had already pointed out in his will. The directions in regard to the entertainment of ministers and others are too explicit, and the reference to the poor too vague, to allow the former to be ignored, or even to be regarded as a subordinate purpose of the will. He even desired that the farm should be so rented as to aid in making it an agreeable home for those whose lots might be cast there in the course of their labors and travels. Taking this reference to the poor in connection with what immediately follows in the same sentence, it is doubtful whether it had reference to anything more

than a surplus in their hands, a part of which they might, if they should see fit, devote to the relief of the poor; for the clause goes on, "Only I would have you and them, as your means shall increase and allow it, to use a part thereof," etc. We do not think the testator intended this instruction or statement to be anything more than incidental to the scheme, which he seems to have had clearly in mind; leaving such an application of the funds, if there should be any, to the judgment of the trustees. Our opinion is, that the will, in the particulars we have thus far considered, does not create a charitable trust.

But in the passage already quoted from the appendix to the will we find the direction for reprinting and circulating writings of the early Friends, as well as those of modern times, which set forth the purity and spirituality of the gospel dispensation. A trust for the publication of religious books is recognized as a charitable trust; of which the case of *Thornton* v. *Howe*, 31 Beav. 14, relating to the publication of the works of Joanna Southcote is a notable example. See, also, *Simpson* v. *Welcome*, 72 Me. 496. The references in the will to the kind of books the testator had in mind sufficiently establish the character of those to be published, and relieve the provisions of the trust from uncertainty on this point. Indeed, it is the one thing he labored to make clear. Here, then, we find a valid trust with reference to a portion of the income.

In cases where a part of an estate is given upon an invalid and a part upon a valid trust, two rules have been laid down and seem now to be established in England.

*First.* If an ascertainable portion of a fund or an estate be given on a void trust and the residue on a good trust, the residue has the benefit of the failure of the prior trust. *In re Birkett*, L. R. 9 Ch. Div. 576; *In re Williams*, L. R. 5 Ch. Div. 735; *Dawson* v. *Small*, L. R. 18 Eq. 114; *Hunter* v. *Bullock*, L. R. 14 Eq. 45; *Fisk* v. *The Attorney General*, L. R. 4 Eq. 521.

*Second.* If an unascertainable portion be given upon a void trust and the residue upon a valid trust, the whole fails. *Chapman* v. *Brown*, 6 Ves. Jun. 404; *Fowler* v. *Fowler*, 33 Beav. 616; *In re Taylor*, *Martin* v. *Freeman*, 68 Law Times Rep. N. S. 538; *Limbrey* v. *Gurr*, 6 Madd. 151; *Attorney General* v. *Hinxman*, 2 Jac. & W. 270; *Cramp* v. *Playfoot*, 4 Kay & J. 479.

Without stopping to consider whether the two English rules can be reconciled upon principle, the latter rule is unquestionably sound. It is based upon the reason that the whole gift is void by reason of the uncertainty of its parts. If the whole income could be spent upon the invalid trust, there would be no surplus for the charity. If the court were to assign a definite proportion to the charity, it might be more or less than the testator intended, and so it would be the court's bequest rather than the testator's. In the present case the cost of the care of the burial lot could be easily ascertained, if it were material, and also the cost of keeping the clock in order ; but the portion required for hospitality is unascertainable. It depends upon the numbers who may apply for it, and upon the judgment of the trustees. Nor can the amount be determined by the provision for reprinting books. That is as indefinite as the other. There is no very explicit direction to publish books ; but assuming it to be so, only a part of the income is to be thus used, and that " as their means shall increase and allow it." This implies what their means will allow after discharging the other trusts of the will. But what part shall be so used, supposing a balance could be ascertained ? The will does not say. The whole income might be applied to hospitality, and where, under a will, a bequest may be applied to other than charitable uses, the bequest is invalid. *Pell* v. *Mercer*, 14 R. I. 412, 442.

The language of Park, C. J., in *Coit* v. *Comstock*, 51 Conn. 352, 386, is applicable to this case. " The bequests as they are, although some portion of the income is to be devoted to a charitable purpose, cannot be supported. If it were otherwise, it would be in the power of an individual to make a perpetuity of property to any extent, by devoting some small portion of the undivided income thereof to some charitable purpose. A little charity in such a case cannot preserve the entire bequest."

We are, therefore, of opinion that the primary purposes of the trust are such as cannot be held to be charitable ; the trust for the burial lot being purely private and personal, and the other only to hold the testator's homestead in perpetuity as an hospitable resort for adherents to the school of his religious belief ; that the reference to the poor is so vague, and the trust for the reception of all such adherents so explicit, as to preclude the inference of a

general, charitable intent, and to show only a particular intent to maintain the hospitality of his house; that these trusts are so controlling in their nature, so unascertainable in their scope, and so inseparable from the trust to publish religious books, that no part of the bequest can be enforced as a charity, and therefore that the whole is invalid.

*Charles E. Gorman & Patrick J. Galvin*, for complainants.

*William Gilpin, Thomas C. Greene & Arnold Green*, for respondent Nichols, trustee.

*Horatio Rogers*, Attorney General, *pro se ipso*.

NOTE. — The above opinion was affirmed after hearing upon bill, answers, and proofs. See 18 R. I.